**JOSEPH M. MEIER ISB No. 3314**
COSHO HUMPHREY, LLP
800 PARK BLVD., STE. 790
BOISE, ID  83712
PO BOX 9518
BOISE, ID 83707-9518
Telephone (208) 344-7811
Facsimile  (208) 338-3290

Attorneys for Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF IDAHO

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 10-40200-JDP |
| Ted Miller Dairy, LLC, | ) | |
| | ) | Chapter 11 |
| | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

## DISCLOSURE STATEMENT

On February 17, 2010 Ted Miller Dairy, LLC (hereinafter referred to as "Debtor") filed its voluntary petition for reorganization pursuant to Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Idaho.  On August 9th, 2010, Debtor filed a proposed Plan of Reorganization a copy of which is attached hereto as Appendix "B".

## INTRODUCTION

THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY BEAR UPON YOUR DECISION TO ACCEPT OR REJECT THE DEBTORS'PROPOSED PLAN OF REORGANIZATION.  PLEASE READ THIS DOCUMENT WITH CARE.

Debtor is providing this Disclosure Statement to all of its known creditors pursuant to Section 1125 of the Bankruptcy Code in order to permit such creditors to make an informed judgment in exercising their right to vote on the Plan of Reorganization.  Section 1125 of the

Bankruptcy Code requires that this Disclosure Statement be submitted to holders of claims against, and interests in, the Debtor and that this Disclosure Statement contain sufficient information about the Debtor to enable creditors and other interested parties to make an informed decision regarding the Plan of Reorganization.  The Disclosure Statement was required to be approved by the court.  The Debtor has complied with requirements of Section 1125 of the Bankruptcy Code and the Disclosure Statement has been approved by the Court as containing adequate information.

THE APPROVAL BY THE COURT OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

Accompanying this Disclosure Statement are copies of the following documents:

Appendix A.    The Court's order approving this Disclosure Statement and affixing the time for the filing of acceptances or rejections of the Plan of Reorganization and for a hearing on confirmation of the Plan or Reorganization;

Appendix B.  The Plan of Reorganization.

Appendix C.  The ballot form for acceptance or rejection of the Plan of Reorganization.

Appendix D.   Schedule B as amended and the Statement of Financial Affairs of the Debtor.

Appendix E.   Debtors' projected income and expenses for March 2011 through December 2011, 2012, 2013, 2014 and 2015.  The budgets commence in March 2011.

Appendix F.  Projection of herd size.  Production for 2011 through 2014 as that is the projected first month of the Plan after confirmation.  Debtor is operating cash collateral budge through February.[1]

Appendix G.  Milk price projections for 2010 through 2015.

---

[1] Debtor has applied for use of cash collateral for the period August 1, 2010 through February 28, 2011 which is set for hearing on July 27, 2010.

**DISCLOSURE STATEMENT**, Page 2
20652-003/594353 JMM/jib 8/9/2010

Appendix H.  Projected cattle rations for 2010 through 2015.

Appendix I.  Historical milk prices received by Debtor from September 2005 through May 2010.

Appendix J.  Historical milk price fluctuation for the industry for January 2005 to May 2010.

Appendix K.  Copies of reports of cattle sales auctions held by Producers Livestock in Jerome Idaho.

This Disclosure Statement is being furnished to all known creditors to inform them about the plan and their rights with respect thereto.  The only representations that are authorized by the Debtor concerning its operations, the value of the Debtor's assets, its reorganization prospects, or other matters are the representations contained in this Disclosure Statement.  The financial information contained in this Disclosure Statement has not been subjected to an audit by an independent Certified Public Accountant.  For that reason, the Debtor is not able to warrant or represent that the information contained in this Disclosure Statement is without any inaccuracy.  However, great effort has been made to ensure that all such information is fairly represented.

To avoid unnecessary duplication of paperwork Debtor has not attached the monthly reports it has filed with the Court as required by the Chapter 11 Bankruptcy Code and the U.S. Trustee Regulations.  These have been delivered to counsel for Wells Fargo Bank, the Unsecured Creditors Committee and Northwest Farm Credit Services.  They are available on the Bankruptcy Court's website or will be produced if a creditor requests a copy thereof.  Debtor believes these show that it has complied with payment of all expenses during the pendency of this proceeding at a time when milk prices had not risen back to the levels Debtor experienced in the last five (5) years.

<u>DEFINITIONS</u>

Unless the context otherwise requires, the following terms, when used in the Disclosure Statement shall have the following meanings:

1.      <u>Administrative Claim</u>:  A cost or expense of administration of this Chapter 11 case, including any actual, necessary expense of preserving or liquidating the estate, any actual, necessary expense of operating the business of Debtors, and all allowances approved by the Court in accordance with the Code.

2.      <u>Allowed Claim</u>:  "Allowed Claim" shall mean a Claim (i) in respect of which a proof of Claim has been filed with the Court on or prior to the Bar Date; or (ii) which is scheduled in the Debtors' schedules of assets and liabilities and statement of financial affairs filed with the Court pursuant to §521 of the Bankruptcy Code and which has not been listed (or is no longer listed on the Confirmation Date, if previously so listed) as disputed, contingent or unliquidated; or (iii) in respect of which a proof of Claim has been filed with the Court with §502(h) or §502(I) of the Bankruptcy code; and in any case as to which no objection to the allowance thereof has been interposed within any applicable period of limitation fixed by Bankruptcy Rule or an order of the Court, or as to which, if objections has been interposed, the Claim has been determined by order of the Court.

3.      <u>Allowed Interest</u>:  "Allowed Interest" shall mean an Interest in respect of which a proof of Interest has been filed with the Court on or prior to the Bar Date.

4.      <u>Bankruptcy Code</u>:  "Bankruptcy Code" or "Code" shall mean the United States Bankruptcy Code, 11 U.S.C. §101 et seq., and any amendments thereof.

5.      <u>Claim</u>:  "Claim" shall mean any right to payment or right to an equitable remedy against Debtors for breach of performance if such breach gives rise to a right to payment, whether or not such right to payment or right to an equitable remedy is reduced to judgment, or whether liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured.

6.      <u>Class</u>:  "Class" shall mean any class into which Claims or Interests are classified pursuant to Article I of the Plan.

7. <u>Confirmation Date</u>:  The first business day occurring on or after the (14th) day after the Order of Confirmation is entered by the Court provided, however, that if a stay of the order confirming the Plan is in effect on such first business day, then the Confirmation Date shall be the first business day thereafter on which (i) no stay of the order confirming the Plan is in effect and (ii) the order confirming the Plan has not been vacated.

8. <u>Contested Claim</u>:  "Contested Claim" shall mean any Claim which is listed on the schedules filed by the Debtors as contingent, unliquidated or disputed or is, or becomes, the subject of an objection filed with the Court in accordance with the provisions of the Bankruptcy Code and which remains unresolved on the Effective Date.

9. <u>Court</u>:  "Court" shall mean the United States Bankruptcy Court for the District of Idaho, presiding over the cases or, if necessary the United States District Court for said district having original jurisdiction over bankruptcy cases and the judges thereof.

10. <u>Person</u>:  "Person" shall mean an individual, corporation, partnership, joint venture, trust, estate, unincorporated organizations, or a government or any agency or political subdivision thereof.

GENERAL HISTORY OF THE DEBTOR

Debtor is an Idaho formed LLC that is currently in the business of operating a dairy in Jerome Idaho.  The LLC was formed in November 2003.  It is owned 100% by Jane Ledbetter now know as Jane Miller. Ms. Miller formed the LLC after her father Ted Miller passed away to run the Dairy facility that her father left her as an inheritance.

Prior to November 2003 Ms Ledbetter and her two sisters conducted business under another entity then know as Ted Miller, LLC.  That entity was formed in July 2002 and then changed its name to U-U Ranch, LLC.  In the early part of this decade the original Ted Miller Dairy, LLC operated a Dairy but that was eventually sold and prior to the petition U-U Ranch, LLC no longer operates a dairy but rather owns real property in several counties.  There is no

connection to the operations of U-U Ranch, LLC and the Debtor other than Ms Miller owns 100% of the Debtor and owns 33 1/3 of U-U Ranch, LLC. That entity is also a creditor of the Debtor. U-U Ranch, LLC does not share or jointly operate any assets and has no operations in the Debtor's dairy.

The Debtor's operations are conducted on real property owned by Ms Miller dba C-M Ranch consisting of approximately 159 acres in Jerome Idaho including a modern Dairy facility located on that property. Debtor pays rent to Ms. Miller. The rent received by the landlord is utilized to pay the underlying note secured by a mortgage on the 159 acres held by Northwest Farm Credit Services as well as taxes, insurance and upkeep on the property. The payment to Northwest Farm Credit Services assists Debtor as it is also a direct obligor on the Northwest Farm Credit indebtedness in the amount of approximately $3,000,000.00.

At the time the petition was filed the Debtor was operating with approximately 1,750 milking and dry Holstein cows and approximately 1,800 heifers. Debtor participates with several other local dairies in a coop wherein milk is pooled and sold to various buyers in the magic valley area of Idaho. Debtor is in compliance with all state, local and federal requirements for operation of a dairy.

Prior to the petition Debtor borrowed funds from Wells Fargo Bank. In 2009 Debtor experienced what all Idaho based Dairy's experienced which was a dramatic downturn in milk prices. See Appendix I and J which shows the drop that occurred in December 2008. Wells Fargo required Debtor to maintain herd value and feed value at a level so that the loan to value was below 75%. As the milk price reduction wore on Wells Fargo Bank determined that the cattle were worth less and feed inventories dropped. During this period and through October 2009 Debtor remained current on all of its payments to Wells Fargo Bank and to its operating

expenses. The operating line of credit was due for renewal in October 2009 but Wells Fargo Bank elected not to renew that obligation.

As stated above in 2009 the drop in cattle value and feed began to erode the equity cushion previously enjoyed by the Debtor. In early 2009 Ms Miller, the principal of the Debtor, was concerned that the Debtor was running into issues complying with its borrowing base. She contacted Wells Fargo Bank's representatives and had her accountants attempt to contact Wells Fargo Bank's representatives in California to discuss with them the problem that the Debtor was facing and the projected inability to meet the borrowing base requirements. This pro active approach was ignored by Wells Fargo Bank for months. Eventually Ms Miller was advised that the Debtor was in default, the representatives at Wells Fargo Bank that she had been dealing with had been terminated and that the Debtor's loan was turned over to special assets.

In an effort to keep its relationship in tact with Wells Fargo Bank, Ms Miller paid a principal reduction of $60,000.00 to the bank in December 2009 that she had received from the Northwest Dairy Association for the redemption of preferred stock owned from 1990 and 1991. Debtor continued to remain current on its operating expenses through late 2009. This payment was in addition to the monthly payments of $150,000 paid on the feed line in 2009 which totaled $1,800,000 and the interest paid current through December 2009.

After this occurred Ms Miller attempted to negotiate on behalf of the Debtor to grant Wells Fargo additional collateral including a second lien in the 159 acre dairy. Wells Fargo would not accept that lien and required Ms. Miller to pledge her interest in an asset that U-U Ranch, LLC owed called the "Standing Hat Ranch". It was believed that the Standing Hat Ranch would sell in late 2009 or early 2010 but that sale did not occur in that time period. Wells Fargo Bank unilaterally set a March 1, 2010 deadline to receive the payments but it threatened

litigation prior to that date and rejected workout proposals made by Debtor. Concerned that Wells Fargo Bank would not allow the Debtor to use the milk proceeds received after February 18, 2010, which would thereby eliminate Debtor's ability to pay all of its operating expenses, feed and care for the large herd the Debtor had no other alternative other than to file this bankruptcy proceeding to attempt to reorganize its affairs over a long term.

One further complication that the Debtor faced was that Ms. Miller and her husband Greg Ledbetter were embroiled in a divorce proceeding at the same time period.  While they are now divorced Mr. Ledbetter is an obligor under at least the Wells Fargo Bank indebtedness and Wells Fargo Bank has sued both Ms. Miller and Mr. Ledbetter to collect from them the same debt that the Debtor is attempting to reorganize in this chapter 11.

RECENT MAJOR ASSET DISPOSITIONS

Debtor is a dairy operation which as part of normal animal husbandry conducts frequent sales of dairy animals.  Income received from these sales has been accounted for in the monthly reports filed by Debtor which are also attached to this Disclosure Statement as an appendix.

As disclosed in the statement of financial affairs filed by Debtor in this Bankruptcy Proceeding, there were prepetition transfers of title to certain real property from the Debtor.  The Debtor held legal title, it discovered, but it never believed it had beneficial title to the property as it had not acquired it or ever carried it on its books.  These transfers include the following:

Debtor delivered a quitclaim deed to a 40 acre parcel located in Gooding County, Idaho to Greg Ledbetter as part of a Judgment and Decree of Divorce on or about January 22, 2010. Debtor believes the property may have a value of $5,000.00 an acre for a total value of $200,000.00.  While legal title was erroneously held in name of Debtor, neither the property nor

its value had been listed on Debtor's books as an asset.  The background on this transfer is as follows:

a.      On April 13, 2005 a parcel of real property was purchased consisting of 218 acres from May Trust by Jane Ledbetter.  Debtor did not carry this property on its books. The purchase price for the property has been carried as a note receivable to Ted Miller Dairy, LLC from Jane Ledbetter.

b.      Subsequently, in 2007 the 218 acres of the real property was sold and transferred to Aardema Dairy in exchange for $479,539.00 cash and the transfer of a parcel consisting of 120 acres to Jane Ledbetter C-M Dairy.  The $479,539.00 in cash was delivered to Ted Miller Dairy, LLC and applied as a credit to the Note receivable owed by Jane Ledbetter to Ted Miller Dairy, LLC.

c.      On 3/31/08 the amount of 80 acres of 120 acres was sold for $398,304.45 to Ledbetter Trust.  That cash was delivered to Ted Miller Dairy, LLC.  The Note receivable owed by Ms. Ledbetter was reduced by $398,304.45.  This left 40 acres remaining from the 120 acres of real property.

d.      The remaining 40 acres was awarded to Greg Ledbetter in a divorce decree entered December 3, 2009.

e.      After the entry of the divorce decree the divorcing parties became aware that the 40 acre parcel was legally titled in the name of Ted Miller Dairy, LLC and not Jane Ledbetter as believed and accounted for in the records of both the Debtor and Ms. Ledbetter.  A quitclaim deed was delivered to Greg Ledbetter on January 22, 2010 by Debtor.  Debtor is informed that the deed was recorded in Jerome County on or about January 22, 2010 by Greg Ledbetter.  This was the incorrect county as the 40 acres is in Gooding County.  Debtor is now

informed the same quitclaim deed was recorded post-petition in Gooding County on March 16, 2010 by Greg Ledbetter.

      3.      On July 5, 2002 an LLC was formed called "Ted Miller Dairy, LLC".  That entity had management vested in Jane Ledbetter, Karen Lopez and Barbara Truitt (see Secretary of State, State of Idaho Articles of Organization filed as W19879 on July 5, 2002).  On November 10, 2003 an LLC named Ted Miller Dairy, LLC changed its name to U-U Ranch, LLC (see Secretary of State, State of Idaho Articles of Amendment filed as Document W19879 on November 17, 2003).  The old Ted Miller Dairy, LLC owned real property which, when it changed its name, was held by U-U Ranch, LLC.

      In 2003 after Ted Miller Dairy, LLC changed its name, a new entity was formed by Jane Ledbetter and Greg Ledbetter which was named Ted Miller Dairy, LLC (see Secretary of State, State of Idaho records Document No. W27010 filed November 18, 2003).  This entity is the Debtor and is not the old Ted Miller Dairy, LLC.

      In January 2010 U-U Ranch, LLC determined that there was confusion regarding a parcel of real property consisting of 160 acres located in Section 31, TS8S Range 16EBM, Gooding County, Idaho.  This property was owned by the old Ted Miller Dairy, LLC when it changed its name to U-U Ranch, LLC in 2003.  A deed was not prepared at that time.  Therefore, on January 26, 2010 a quitclaim deed was executed by the Debtor to clarify the name change.  Debtor does not believe this is a reversible transfer as it reflected only the name change and not a transfer of property for value.  (Instrument No. 233263 records of Gooding County, Idaho recorded January 26, 2010.).

In addition to this property certain equipment was transferred to Greg Ledbetter as disclosed in the Statement of Financial Affairs filed by the Debtor on March 3, 2010 (Docket 27).

## DESCRIPTION OF DEBTORS BUSINESS MODEL

Debtor operates a Dairy consisting of approximately 1750 cows and 1800 replacement Heifers. Debtor is milking these cows four times a day and is in full compliance with all regulations. Debtor's operation is modern and does not have any problems with the quality of its milk or the quantity produced. Debtor is here simply because milk prices dropped dramatically and did not rise back up soon enough.

Debtors plan envisions that Debtor shall reorganize under the following parameters:

1.    Debtor will continue to operate to produce the quality product. It shall maintain its herd size and quality by continuing to feed and care for the animals. See its projections of herd size attached as Appendix F and feed rations attached as Appendix H. Wells Fargo Bank shall continue to retain its lien in the cows and shall be authorized to conduct periodic inspections as has been allowed during this bankruptcy proceeding.

2.    Debtor continues to look for buyers of its operation. Debtor believes that when milk prices recover that sales will be available. Debtor believes if the cows are sold before milk prices recover that the Debtor and therefore the creditors will suffer dramatic losses. Debtor believes that the herd would be sold as beef which would recover approximately one third the value as a milking animal. To substantiate this concern, attached hereto as Appendix K is sales data from Producers Livestock showing recent sales in Idaho.

3.      Debtor continues to look for takeout financing.  Like the sale it expects it will not be realistically available until the market changes.

4.      Ms. Miller continues to be willing to pledge her real property consisting of 159 acres to secure Wells Fargo Bank until it is paid.  Ms. Miller believes that there is over 2 million in equity in that property behind the first lien of Northwest Farm Credit Services.

5.      The Debtor will commence making the payments described in the Plan, which include monthly interest payments to Wells Fargo in addition to periodic payments of principal.  It also projects payments to other secured, priority and unsecured creditors.

6.      The Debtor has obtained agreements from relatives of Jane Miller to forego any payments on their debts until the other creditors in the Plan are paid.  Foregoing payments on these debts, which exceed $2 million, help Debtor with its proposed 100% pay out to all non-insider creditors.

PENDING LEGAL PROCEEDINGS

1.      State court and federal court actions: There were no lawsuits pending against the Debtor at the time the bankruptcy proceeding was filed.  As stated above, however, Wells Fargo Bank filed suit against Greg Ledbetter and Jane Miller seeking to collect on the guaranty they made of the Debtor's obligation to Wells Fargo Bank.  Should Ms. Miller be forced into a bankruptcy because of the actions of Wells Fargo Bank, this may affect her ability to continue to pledge the real property under the Plan or provide other relief to the Debtor.  Examples of this other relief include Ms. Miller's willingness to reduce the market rent paid to her for the dairy to facilitate higher monthly payments to Wells Fargo Bank since the bankruptcy proceeding began. These higher payments are at least $11,000.00 per month.

2.      Debtor has evaluated preference payments made and liens granted within 90 days of the Bankruptcy.   Debtor has also evaluated sales and other transfers.   Debtor has also evaluated the sales and transfers made as to whether these can be avoided under 11 USC 548 or other appropriate statutes.   There are transfers that could be avoided as preferences and there were transfers of equipment to Greg Ledbetter.   As this plan is a 100% pay out to all non-insider creditorsDebtor believes that the cost and time that would be incurred would be counterproductive to the reorganization, Debtor would prefer to focus entirely on the repayment of the obligations over time rather than the litigation that would come pursuing preferences.   The statement of financial affairs discloses the preferences and the transfers of equipment to Greg Ledbetter and can be consulted by Creditors.   These are attached as an appendix to this disclosure statement.   In the event Debtor discovers new information, it reserves the right to pursue these prepetition transfers for the benefit of creditors.

## BASIS OF VALUATION

The basis of the evaluation of property contained in the liquidation analysis, or best interest of creditors' test, was obtained from various sources.   The Debtor has had various experiences with the purchase and disposal of, equipment, and has a practical experience in understanding the value of such personal property.

IT SHOULD BE BORNE IN MIND THAT THE VALUES ESTABLISHED IN THIS ANALYSIS ARE ONLY THE BEST ESTIMATES OF THE DEBTOR.   These values were arrived at by assuming that the entirety of the Debtor's assets would be liquidated and it is assumed that different values might be obtained in limited or spot sales of similar property over an extended period of time.   It must be kept in mind that secured creditors will exert a major effort to reclaim their property at the earliest possible time to avoid their collateral being

involved in the liquidation process.  This sort of activity will reduce the liquidation value of the Debtor's estate.

## LEASE OBLIGATIONS

1.      Debtor is Lessee under Leases with the following:  Debtor leases real property located on 268-A South 500 West, Jerome, Idaho which contains 159 acres, it milking facilities, its office and its feed.  This is leased from Jane Miller d.b.a. C-M Ranch.  The rent paid is the amount necessary to pay the monthly debt service outstanding lien secured by the real property held by Northwest Farm Credit Services, real property taxes and insurance.[2]  The Debtor is also indebted to Northwest Farm Credit Services.  Debtor believes it is paying at or below market rent for the location and therefore it is in the best interest of the estate to assume the lease. Debtor is not in default under the lease.

## LIQUIDATION ANALYSIS
### "Best Interests of Creditors Test"

Notwithstanding acceptance of the Plan by creditors, in order to confirm the Plan the Court must independently determine that the Plan is in the best interests of all classes of creditors and stockholders.  The "best interest" test requires that the Court find that the Plan provides to each member of each impaired class of claims and interest a recovery which has a present value at least equal to the present value of a distribution which each such person would receive from the Debtor if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code instead of being reorganized under Chapter 11 of the Bankruptcy Code.

To calculate what members of each impaired class of unsecured claims or interest would receive if the Debtor was liquidated, the Court must first determine the dollar amount that would be generated from the disposition or liquidation of the assets of the Debtor in excess of the amount necessary to pay allowed secured claims, plus the cash held by the Debtor, and plus

---

[2] Since the petition was filed Debtor has not been making full payments.  It has only paid amounts sufficient to pay Northwest Farm Credit Services.  Jane Miller has been paying taxes and insurance herself and waiving claims to those to assist Debtor.  The reduction in rent has directly benefited Wells Fargo Bank as it has received monthly payments of adequate protection which were increased due to the rent reduction available to Debtor by approximately 10 months at $11,000 per month.

**DISCLOSURE STATEMENT**, Page 14
20652-003/594353 JMM/jib 8/9/2010

recoveries on actions against third parties. The proceeds of this liquidation will then be reduced by the costs of the liquidation. Such a liquidation would probably take place in a Chapter 7 proceeding and such a proceeding would likely include the fees of a trustee as well as those of counsel and other professionals that might be retained by such trustee, selling expenses (including costs of advertising and auctioneer's fees or brokerage commissions) unpaid expenses incurred by the Debtor during its reorganization proceedings under Chapter 11, and claims arising by rejection by the trustee of obligations incurred by the Debtor during the pendency of the Chapter 11 case.

The value of the distributions after liquidation, deduction of costs of liquidation, and in keeping with the analysis described above would then be compared by the Court with the present value being offered to each of the classes of unsecured claims and interests under the Plan.

The Debtor also believes that unsecured claims in liquidation would be significantly greater than under the present circumstances. For example, many contracts and leases which would be assumed pursuant to the Plan would probably be rejected in liquidation and would give rise to unsubordinated claims against the liquidation proceeds. These obligations are generally taken care of in Debtor's Plan and because they are paid over time will increase the amount of distribution under the Plan to unsecured creditors.

The proponents also believe that liquidation of the Debtor's estate would be a time consuming matter and might involve litigation between a Chapter 7 trustee and the various claimants to assets of the estate. It would not be unusual that no distribution to unsecured creditors in a Chapter 7 liquidation proceeding would be forthcoming for two or more years.

THE DEBTOR FIRMLY BELIEVES THAT THE PLAN IS IN THE BEST INTERESTS OF EACH CLASS OF CREDITORS.

The following pages set forth assets, liabilities and estimated expenses Debtor is using to calculate its liquidation analysis.

## I. ASSETS

<table>
<tr><td></td><td>Estimated at<br>Confirmation Date</td></tr>
</table>

A.   Bank Accounts
Wells Fargo Cash Collateral Account                $0.

For the basis of this calculation Debtor is paying administrative expenses from its milk proceeds and adequate protection payments.  After administrative expenses and adequate protection are paid there will not be substantial additional sums in that account.

B. Receivables:
Accounts Receivable:                $2,917,717.00
C. Feed:
Feed                $1,208,027.00

D. Equipment & Vehicles:
1. Titled Vehicles not encumbered with a lien see full
description on attached Appendix D                $135,850.00

2. Equipment encumbered by liens                $624,749.00

3. Case Skidster Loader                $20,000.00

4. Office Equipment                $1,500.00

TOTAL EQUITY IN TITLED VEHICLES:                $782,059.00

E. Animals:                $3,962,788.00

F. Milk Proceeds:                $504,000.00

## II. LIABILITIES

The liabilities that are secured by particular assets are described above.

A.   Secured Indebtedness (other than the first liens described above):
Creditor Wells Fargo Bank claims a lien by virtue of its blanket
lien in every asset other than the titled vehicles.                $(6,008,393.82)

B.   Unpaid Estimated Administrative Expenses:                $(40,000.00)
As stated above Debtor has been operating under a court order approving the use of cash collateral.  All post petition administrative claims are paid from ongoing milk proceeds and so Debtor does not project many unpaid administrative claims at the confirmation date other than the Debtor's attorney; accountants; and the Unsecured Creditors Committee's attorney who must

apply for and obtain court approval of their fees and cost.  The Debtor's attorneys are holding a
retainer of $24,587.00 but the fees and costs will substantially exceed this retainer.

C.      Estimated General Unsecured Creditors
                      Total Claims (approximately)            $ (3,100,000.00)

        This calculation of total claims does not include the $3,025,213 claim of Northwest Farm
Credit Services or the $6,042,666.82 claim of Greg Ledbetter.  Debtor did not count these as it
believes that if liquidated Northwest Farm Credit Services would be paid through the liquidation
of nondebtor real property assets secured by that creditor and Greg Ledbetter's claim is tied
directly to the same claim filed by Wells Fargo Bank, since it appear to be an indemnification
claim.  If Wells Fargo Bank is paid Greg Ledbetter's claim is extinguished.

## SUMMARY OF FIGURES USED FOR LIQUIDATION ANALYSIS

### I. ASSETS

|   |   | NET VALUE | % Upon Liquidation | Estimated Value Upon Liquidation |
|---|---|---|---|---|
| A. | Bank Accounts: | $0 | n/a | $ 0 |
| B. | Receivables: | $2,917,717 | 30% | $ 875,315 |
| C. | Feed    : | $1,208,027 | 75% | $906,020 |
| D. | Equipment: | $782,059 | 75% | $586,544 |
| E. | Animals | $3,962,788. | 75% | $3,172,091 |
| F. | Milk | $504,000. | 100% | $504,000 |
| TOTAL Liquidation Value: | | $9,374,591 | | $6,043,970 |

Debtor assumes that the accounts receivable are not collectible.  Jane Miller owes a large account
but if the operation fails it is likely that the real property owned by her will be liquidated and
therefore the collection of the account will be difficult.  Therefore the Debtor has determined that
the face amount of the account receivable should be reduced to 30%.
Debtor also believes that liquidation of the animals would create large discounts.  The value of
the animals is based on an ongoing milking cow and not beef liquidation.  The liquidation of the
cows, by moving them will reduce their value quickly as buyers will be concerned about quality,
stress and disease.
In light of the value of the animals and the majority of the equipment above the secured creditors
will not be satisfied in full from the liquidation of the assets and will have deficiency claims.

## EXPLANATION OF LIQUIDATION VALUE

1.      NET EQUITY – WELLS  INDEBTEDNESS (see above):
        $6,043,950  -    $6,042,666. = $0

2.      Less Estimated Net Administrative Expenses-Ch. 11              $ (40,000.00)
                      Unpaid at time of confirmation

3.      Less <u>Chapter 7 estimated expense including</u>:

            Chapter 7 Trustee @ 3% :          $(5,000.00)

            Chapter 7 Accountant :         $(2,500.00)

            Chapter 7 Attorney:          $(10,000.00)

4.      Less priority claims of  State of Idaho:         ($379.00)

5.      Less priority claim of Internal Revenue Service:    ($42,225.13)

6.      Total Available to Fund Unsecured Creditors:    $0.

ESTIMATED DISTRIBUTION OF<br>LIQUIDATION PROCEEDS

Based on the Debtor's schedules the estimated amount of unsecured claims is approximately $3,100,000.00 excluding the claim of Northwest Farm Credit Services and Greg Ledbetter, explained above.

**BASED ON THE FOREGOING ANALYSIS DEBTOR BELIEVES THAT UNSECURED CREDITORS WOULD RECEIVE $0 IN THE EVENT TED MILLER DAIRY, LLC'S ASSETS WERE LIQUIDATED.  DEBTOR BELIEVES ITS PLAN, WHICH KEEPS IT IN BUSINESS, WILL BENEFIT CREDITORS IN TWO WAYS.  FIRST, DEBTOR WILL REMAIN IN BUSINESS THEREBY GENERATING NEW BUSINESS FOR THE MAJORITY OF ITS EXISTING CREDITORS.  SECOND UNDER ITS ANALYSIS IF IT WERE LIQUIDATED NO UNSECURED NONPRIRORTY CREDITOR WOULD BE PAID ON ITS CLAIM.   THIS PLAN ENABLES THE DEBTOR TO PAY ONE HUNDRED PERCENT OF ITS UNSECURED CLAIMS HELD BY NON-INSIDERS AND ALLOWS A WAY TO PAY BACK SECURED CREDITORS THEIR ALLOWED SECURED CLAIMS AND ALL PRIORITY CREDITORS TO BE PAID.**

Debtor's Plan proposes to split the $3 million unsecured claim holders into two classes. The first class (Class 8) are all unrelated creditors.  Those claims have been calculated on Exhibit "A" attached to the Plan.  Debtor believes they total approximately $538,000.00.  The Plan

proposes payment in full.  The balance of approximately $2.5 million of claims are put in Class 9 and will only be paid after other creditors are paid.

CONFIRMATION OF THE PLAN

1.     Voting Procedure:

All creditors entitled to vote on the Plan may cast their votes for or against the Plan by completing, dating and signing the "Ballot for Accepting or Rejecting Plan of Reorganization" attached to this Disclosure Statement as Appendix C.  The Ballot must be filed with the Bankruptcy Court and may be submitted personally or by mailing such Ballot to the U.S. Bankruptcy Court, 550 West Fort, P.O. Box 42, Boise, Idaho 83724.  In order to be counted all ballots must be filed or received by the Bankruptcy Court prior to 5:00 o'clock p.m. on the date specified in the order approving the Debtors' Disclosure Statement.

2.     Persons Entitled to Vote on Plan:

Only the votes of classes of creditors whose claims or interests are impaired by the Plan of Reorganization will be counted in connection with confirmation of the Plan of Reorganization. Generally, and subject to the specific provisions of Section 1124 of the Bankruptcy Code, this includes any creditor who, under the Plan, will receive less than payment in full in cash of the allowed amount of their respective claims on the Effective Date of the Plan or if a creditor's legal, equitable or contract rights is altered by the Plan.  In determining acceptance of the Plan, votes will be counted only if submitted by a creditor whose claim is scheduled by the Debtors as undisputed, noncontingent and liquidated, or who, prior to the hearing on confirmation, has filed with the Bankruptcy Court a Proof of Claim which has not been disallowed, disqualified or suspended prior to computation of the vote on the Plan.  The ballot which accompanies this Disclosure Statement does not constitute a Proof of Claim.  If you are uncertain whether your claim has been correctly scheduled, you should check the Debtors' schedules which are on file with, and may be inspected at, the Bankruptcy Court, 550 West Fort, Fourth Floor, Boise, Idaho 83724.

3.      Acceptances May Not be Necessary to Confirm Plan:

Under Section 1126 of the Bankruptcy Code an impaired class is deemed to have accepted the Plan if (1) at least 2/3 in amount and (2) more than ½ in number of the allowed claims or interests of class members who have voted on the Plan have voted to accept it.  Further, unless there is unanimous acceptance of the Plan by an impaired class, the Bankruptcy Court must also determine that under the Plan such class members will receive property of value, as of the effective date of the Plan, that is not less than the amount that such class member would receive or retain if the Debtors were liquidated under Chapter 7 of the Bankruptcy Code on the effective date of the Plan.  Even if all classes of claims or interests accept the Plan, the Court may refuse to confirm the Plan.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and there are other provisions therein which may affect confirmation exclusive of the votes of creditors.  However, this is a liquidation Plan and strict adherence as to these standards may not be required.

4.      Confirmation of Plan Without Acceptances:

The Court may confirm a Plan even though less than all of the classes of claims or interests accepts the Plan.  The circumstances under which the Court may confirm a Plan over the objection of a class of claims or interests are set forth in Section 1129(b) of the Bankruptcy Code.  This section provides that the Court may confirm a Plan notwithstanding its rejection by one or more impaired classes if the Court finds that the Plan does not discriminate unfairly and is fair and equitable with respect to each impaired class which does not accept the Plan.  With respect to classes of secured creditors, the fair and equitable test requires that a secured creditor (1) retain its lien and receive cash payments having a present value equal to its allowed secured claim, and (2) receive the proceeds of the sale of its collateral, or (3) realize the indubitable equivalent of its claim the extent validly secured.

With respect to a class of unsecured claims, the fair and equitable test requires that if each creditor in such class does not receive property having a present value equal to the amount

of such creditors allowed claim, no junior class can receive or retain any property.  The proponent of the Plan will rely on the features of Section 1129(b) in the event there is a rejection of the Plan by a class of claims or interests.  Under this Plan the equity holder Ms Ledbetter  will not receive any monetary distribution on account of her shares until all allowed claims are paid in accordance with the terms of the Plan.  As shown by the budget Ms. Ledbetter will receive salary or draws to compensate her for services given to the Debtor after the Plan is confirmed.

The invocation of the provision of 1129(b) is a legal matter required to be heard by the court at the confirmation hearing or at a hearing set by the court.

5.      Consequences of Confirming the Plan:

Confirmation of the Plan will discharge the Debtors from all of their prepetition debts except as otherwise provided for in the Plan, the Order of Confirmation or Section 1141 of the Bankruptcy Code.  Confirmation makes the Plan binding upon the Debtors, creditors and other parties in interest regardless of whether they have accepted or rejected the Plan.  Confirmation of the Plan will, generally, provide for the distribution of value to the creditors as set forth in the Plan.

6.      Hearing on Confirmation of the Plan:

The Bankruptcy court has set a hearing date to determine whether the Plan has or will be accepted and whether the other requirements for confirmation of the Plan have been satisfied.  A time for hearing for confirmation of the Plan has been established in Appendix A hereto and each creditor and shareholder should make note of that Notice of Hearing and determine whether or not they want to attend.  Attendance is not mandatory to establish a claim and, as also set forth in Appendix A, all ballots must be filed with the Bankruptcy Court prior to the date set for hearing on Confirmation of Plan.

7.      Retention of Jurisdiction:

If the Plan is confirmed, the Bankruptcy Court will retain jurisdiction, as more specifically set out in the Plan, to adjudicate the allowance of claims, the value of secured

interests, the disposition of executory contracts or unexpired leases, the avoidance of liens or transfers, litigation concerning claims and property of the estate, rule on modifications of the Plan if any, and to issue such orders and judgments as may be necessary to implement the Plan and resolve disputes concerning the Plan.

8. Risks of Confirmation:

The Plan presumes that the Debtor can make the income that it is projecting to make the payments to claims described in the Plan. It also presumes that the business of the Debtor will improve over a number of months and the nothing more than ordinary inflation will be experienced by the Debtor during the Plan. If these assumptions turn out to be incorrect it may be difficult for the Debtor to complete the payments projected herein and the indebtedness will be discharged. On the other hand Debtor believes that the income in the future is the only manner in which the Debtor can pay its claims as described in the Plan.

9.      Contributions by Equity:

As described by the Plan Ms. Miller shall contribute several assets to assist the Debtor and to create an equity contribution. She intends to pledge her 159 acre Jerome Property subject to the lien of Northwest Farm Credit Services in the amount of approximately $3,000,000 to secure the Wells Fargo Bank indebtedness. Ms. Miller believes that real property has a value that exceeds $5.3 million dollars. Further, Northwest Farm Credit Services holds liens to secure the $3 million on other property. If confirmed, Wells Fargo Bank's collateral position will therefore improve by over $2 million dollars. This, the Debtor believes, substantially reduces the risk Wells Fargo Bank has regarding the continue liability of the Debtor and its protection for the loan of Wells Fargo Bank. This is in addition to the approximate 10 months of dairy rent that was reduced by $11,141.00 per month not received by Jane Miller. Further, immediately prior to the petition Ms. Miller negotiated three months of forebearance, totaling $75,295.50, from Northwest Farm Credit Services, which funds were left in the dairy. The Debtor therefor has

benefited in the amount of $186,810.50 by forebearance by Ms. Miller and the creditor that holds

a lien on Ms. Miller's assets.

BANKRUPTCY SCHEDULES

This Disclosure Statement is meant to disclose all of the assets and liabilities of the

Debtors.  To the extent it contradicts the bankruptcy schedules on file with the Bankruptcy Court

the disclosures contained in this Disclosure Statement control over any ambiguities.

THIS DISCLOSURE STATEMENT of Ted Miller Dairy, LLC is submitted this   6th

day of August, 2010.

Ted Miller Dairy, LLC

/s/ Jane Miller
By: Jane Miller
It's Managing Member


COSHO HUMPHREY, LLP


By   /s/ Joseph M. Meier
Joseph M. Meier, Attorney for Debtor

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on the __9th__ day of August, 2010, I filed the foregoing electronically through the CM/ECF System, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

William J Batt on behalf of Interested Party Greg Ledbetter
wjb@battfisher.com

Robert A Faucher on behalf of Creditor Wells Fargo Bank, National Association
rfaucher@hollandhart.com, boiseintaketeam@hollandhart.com;ntpratt@hollandhart.com

John R Hammond on behalf of Interested Party Greg Ledbetter
jrh@fpa-law.com

R Ron Kerl on behalf of Creditor Northwest Farm Credit Services, FLCA
Ron@cooper-larsen.com, jamieb@cooper-larsen.com

Mary P Kimmel on behalf of U.S. Trustee US Trustee
mary.p.kimmel@usdoj.gov

Robert J Maynes on behalf of Creditor Committee The Official Committee of Unsecured Creditors
mayneslaw@hotmail.com, robert.maynes@gmail.com;rosie.mayneslaw@gmail.com

David Wayne Newman on behalf of U.S. Trustee US Trustee
david.w.newman@usdoj.gov

Larry E Prince on behalf of Creditor Wells Fargo Bank, National Association
lprince@hollandhart.com, chardesty@hollandhart.com;boiseintaketeam@hollandhart.com

Scott A Tschirgi on behalf of Creditor Pioneer Commodities
sat@satchartered.com, mlennox@satchartered.com;gschow@satchartered.com

US Trustee
ustp.region18.bs.ecf@usdoj.gov

**10-40200-JDP Notice will not be electronically mailed to:**

Mike Edwards
Frazer Frost, LLP
2250 W. Main Street, Ste. B
Visalia, CA 93291

Russ Dean Ford, Inc., a Washington corporation
c/o Craig W. Christensen
Attorney at Law
P. O. Box 130
Pocatello, ID 83204


/s/ Joseph M. Meier
JOSEPH M. MEIER